**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Prim Securities, Inc.,** | ) | **CASE NO. 05-CV-783** |
| **Prim Advisors, Inc.** | ) | |
| **Plaintiffs,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **Vs.** | ) | |
| | ) | |
| **William McCarthy** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendant.** | ) | |

**INTRODUCTION**

This matter is before the Court upon Defendant William McCarthy's Motion for Summary Judgment on Plaintiffs' Amended Complaint (Doc. 65) and Defendant's Motion for Summary Judgment on Counterclaims (Doc. 67).[1] This action relates to McCarthy's past employment relationship with Plaintiffs Prim Securities, Inc. ("PSI") and Prim Advisors, Inc. ("PAI"). For the following reasons, McCarthy's Motions are GRANTED in Part.

---

1 Also pending are Defendant's Motion to Strike Affidavits of Joseph Lombardo, Anthony Delfre and Thomas Kusak (Doc. 76), Plaintiffs' Motion to Dismiss FLSA Counterclaim (Doc. 83) and Plaintiffs' Motion to Amend Reply to Defendant's Counterclaim (Doc. 85). In light of the Court's disposition of Defendant's Motions (Docs. 65, 67), Docs. 76, 83 and 85 are moot.

**FACTS**

William McCarthy graduated from the University of Notre Dame with a law degree and an MBA in 1999. PSI and PAI (collectively "Prim") are financial services companies located in Cleveland. McCarthy's uncle had a number of contacts with Prim which eventually resulted in an interview and job offer. McCarthy describes his job with Prim as "doing deals." He would utilize his personal connections to develop business for Prim. At the time he began his employment with Prim in October of 1999 he was not a licensed securities salesman (also known as registered representative) and had no intention of becoming one. Rather, he contemplated that his job would consist of doing deals along with some limited legal services.

From October of 1999 through June of 2000 McCarthy was paid $3000 a month. These payments are evidenced by W-2 forms that correspond to the amount he would have received at $3000 a month during the relevant period. He was not a registered representative, and as such did not receive commissions from the securities transactions of customers he introduced to Prim.[2] Those customers were handled by Anthony Delfre. Delfre generally supervised all of McCarthy's work. McCarthy could not originate a deal without Delfre's approval, and prior to receiving his license as a certified financial planner ("CFP") in September of 2000 was unable to use any independent judgment in securities matters.

Sometime in Spring of 2000 McCarthy was told that he "was not pulling his weight around Prim" and Prim stopped paying him in June. McCarthy nonetheless continued to work without pay. He believed that certain deals would come to fruition that would "dwarf" his

---

[2] McCarthy avers that he would be entitled to a commission on any "deals" conducted by his customers, such as an acquisition, divestiture, refinancing, or third-party administration contract.

former salary. McCarthy also chose to pursue a license as a CFP. He discussed taking classes related to the CFP examination with Mike Brady of Prim. Brady eventually signed off on approvals for the Corporate Tuition Reimbursement Program whereby Prim agreed to pay McCarthy's tuition at Myers College. McCarthy took a number of courses and eventually passed a CFP examination on September 25, 2000. He claims that he would not have taken the Myers courses without Prim's promise to pay.

Prim did not pay McCarthy's tuition and Myers College sought payment. Discussions between Prim and Myers College resulted in an October 23, 2000 letter from Prim stating that "this letter shall serve as confirmation to pay the balance of the above referenced tuition account in ten equal monthly installments in the sum of $400.00, with the last (eleventh) installment payment in the amount of $335.29." As of January 31, 2001, Prim had made only the first payment. Accordingly, Myers College threatened to report the delinquent payment on McCarthy's credit unless McCarthy and PSI signed a promissory note obligating them to pay $400 per month until the balance of $3935.29 plus 1.5% interest per month was paid. McCarthy responded with a letter to Brady in which he laid out his understanding of events and sought indemnification should he be held liable on the promissory note. Prim refused to do so and McCarthy resigned. His resignation letter states the following:

> This correspondence also serves as a formal demand for Prim Capital Corporation to honor its contractual commitment to me and remit the sum of Three thousand nine hundred and thirty-five and 29/100 dollars ($3,935.29) to David N. Myers College on my behalf. As we discussed, I would not have enrolled in the Certified Financial Planning courses at David N. Myers College but for the promise by Prim Capital Corporation to pay for those courses. I have now received information that if the full amount of tuition is not timely remitted, my personal credit rating will be negatively impacted.

Plaintiffs' indemnity claim in this lawsuit relates to an account that McCarthy brought to

Prim during his employment. One of McCarthy's contacts was Robert Bennett, a partner in the Bennett Partnership. McCarthy told Prim he wished to pursue Bennett as a client. Prim has presented the affidavit of Joseph Lombardo. Lombardo contends that he believed Bennett "to be very litigious and unethical" and that he "had a conversation with Mr. McCarthy where he stated that he would have to take complete responsibility for The Bennett Partnership account if the account was opened at [PSI] and [PAI]." McCarthy denies that any such conversation took place.

In any event, McCarthy sent a letter to Bennett proposing a number of investment options.[3] The letter states that "we evaluated two different money managers that fit your investment profile." One of those was Navallier. The letter also provided information on the Prim Asset Consulting Services ("PACS") program. McCarthy avers that he did not have substantive input into the proposal—a contention which Prim has not denied.

The Bennett Partnership eventually decided to invest $300,000 with Prim. An initial PACS "Confidential Investor Profile" was signed by McCarthy on February 24, 2000. However, this PACS profile was not submitted to the Partnership. Rather, Bennett signed a series of documents also signed by Delfre on March 6, 2000. Bennett signed a PACS "Investment Management Agreement," a PACS "Confidential Investor Profile," and a PACS "Investment Policy Statement." The Investment Management Agreement indicated that the Partnership's investment would be managed by Navallier. Navallier, it turns out, was a manager primarily invested in small cap stocks. The Confidential Investor Profile and Investment Policy Statement

---

[3] McCarthy now contends that he was not authorized to do so, since the December 13, 1999 letter was submitted prior to his CFP certification.

indicated that the Partnership's account would be managed under PACS Model 80 for "Long Term Growth." The profile for the PACS Model 80 stated that over 50% of the assets would be invested in bonds and large cap stocks.

The account was managed by Navallier and the Partnership's investment lost nearly half of its value over the next year. In early 2001, McCarthy participated in a phone call with Bennett and faxed some information to Bennett. Bennett was not satisfied and in a May 24, 2001 letter demanded the return of the full initial investment on behalf of the Partnership. He contended that he was misled that the account would be invested in a relatively low risk manner in accordance with the PACS Model 80 rather than in the high risk Navallier fund. Five days later, Brady, Delfre and Lombardo called McCarthy at his new employer and recorded the conversation. In that conversation, McCarthy confirmed his belief that Bennett was aware that the Partnership's funds were managed by Navallier.[4] Prim's General Counsel then responded to Bennett by letter:

> Your demand is nothing more than a "heads I win, tails you lose" claim that is unwarranted in law, not to mention lacking in facts to support it as well. You cannot participate in a program for over a year, receive confirmations and statements, and then, when you decide you are unhappy with the results, appear like Louis in Casablanca and purport to be shocked that there was trading in equities on your account. You knew it all along.
>
> * * *
>
> It was only with great reluctance, and upon the insistence of Will McCarthy, that Prim even agreed to allow you to open an account, due to Prim's concern that you might engage in perfidy. It appears that that fear has been realized. This has been a difficult year in the market for virtually all investments. Prim is not a guarantor

---

4 Prim also contends that during the call McCarthy confirmed that he had taken responsibility for Bennett's investment. Having reviewed the transcript, the Court disagrees.

> of results.
>
> Be advised, also, that since Will McCarthy set up this account for you, served as your representative, recommended the program you selected, consulted with you concerning it, and has told us that you agreed to everything, we will be looking to him as well as yourself for reimbursement of any costs you might force us to incur in defending your spurious charges.

An arbitration panel disagreed with Prim and awarded the Partnership $35,500. Prim's indemnity claim of $100,000 is for the award itself as well as the costs and legal fees associated with the arbitration. Prim's claim for indemnity is based on the alleged oral promise to "take responsibility" for any dealings with Bennett as well as an express indemnity provision included in a Registered Representative Contract signed by McCarthy on December 7, 2001, or nine months after the Partnership's assets were invested with Prim.[5] The Contract provides as follows:

> Representative hereby agree[s] to defend, indemnify and hold harmless Prim Securities from all losses, liabilities, claims, damages and expenses arising out of or based upon Representative's or Representative's agent's errors or negligence, as well as any violation or alleged violation of the above laws, rules and regulations whether or not resulting in litigation or court action against Prim Securities.

Because the contract was signed well after the Bennett Partnership's investment, the parties dispute the retroactive effect of this provision. Specific provisions of the contract that relate to retroactivity will be discussed in more detail *infra*.

In addition to seeking summary judgment that he is not under an obligation to indemnify Prim, McCarthy also seeks summary judgment on his counterclaims. First, McCarthy claims that he is owed the Myers tuition he paid under theories of breach of contract, promissory

---

5 A draft Registered Representative Contract was signed by McCarthy on March 31, 2000 but never completed.

estoppel and conversion. Second, he claims that under the Fair Labor Standards Act he is entitled to a minimum wage for the period that Prim did not pay him. Third, he claims that he is entitled to commissions earned after he signed the Registered Representative Contract.

## STANDARD OF REVIEW

In accordance with Federal Rule of Civil Procedure 56, summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *LaPointe v. UAW Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323. A fact is material only if its resolution might affect the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party pursuant to Federal Rule of Civil Procedure 56(e), which provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In ruling upon the motion, the court must afford all reasonable inferences and construe

the evidence in the light most favorable to the nonmoving party. *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995); *United States v. Hodges X-Ray, Inc.*, 759 F.2d 557, 562 (6th Cir. 1985). However, "[t]he nonmoving party must come forward with some significant probative evidence to support its claim. If the nonmoving party fails to make a sufficient showing on an essential element, which it has the burden of proof, the moving party is entitled to summary judgment." *Brumbalough v. Camelot Care Centers, Inc.*, 427 F.3d 996, 1001 (6th Cir. 2005) (citing *Celotex*, 477 U.S. at 323-24).

## DISCUSSION

### Plaintiffs' Claim

The Court will first address McCarthy's Motion for Summary Judgment on Plaintiffs' Amended Complaint. Prim's indemnity claim is based on the indemnity clause in the December 2000 Registered Representative Agreement. The Court agrees that McCarthy's actions with respect to the Bennett Partnership account cannot serve as a basis for liability under the indemnity clause.

The actions that resulted in Prim's liability to the Partnership all occurred prior to the date that McCarthy and Prim executed the Agreement. McCarthy's solicitation letter to the Partnership was sent in December of 1999. The actual account documents were signed on March 6, 2000, and most of the trades at issue were made on the account in the months before McCarthy signed the Agreement. Thus the retroactive effect of the indemnity clause is critical to Prim's claim.

The Court agrees with McCarthy that the Agreement is unambiguous and does not apply to acts prior to the date of its execution. Whether a contract is ambiguous is a matter of law for

the Court. *Latina v. Woodpath Dev. Co.*, 567 N.E.2d 262, 264 (Ohio 1991). The ambiguity must appear on the face of the contract; extrinsic evidence cannot render an otherwise unambiguous contract provision ambiguous. *Shifrin v. Forest City Enters., Inc.*, 597 N.E.2d 499, 501 (Ohio 1992). Prim points out that the indemnity clause is silent as to its retroactive effect. However, the Court must interpret the contract as a whole. *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003). The Agreement clearly states that its provisions are forward-looking: "Upon execution of this contract by both parties the Representative *will become* a Registered Representative of Prim Securities . . . ." (Emphasis added).

Prim argues that Schedule 3 to the Agreement demonstrates that portions of the Agreement were meant to apply retroactively. However, a detailed review of Schedule 3 in concert with the remainder of the Agreement compels the opposite conclusion. Schedule 3 provides "a list of persons and entities that Representative has introduced to Prim Securities for the purpose of earning securities commissions from them, and has done so prior to the date of execution of this agreement. Therefore all commissions generated from these clients, for securities commissions calculations only, are subject to the fee splitting schedule . . . outlined in Schedule 1 of this agreement." Schedule 1 was "intended to specify how Representative *is to be paid* by Prim Securities for securities commissions generated as results of efforts by Representative with persons and entities listed in Schedule 3 of this agreement." (Emphasis added). In other words, Schedule 3 is a list of past relationships that McCarthy was to receive credit for in the payment of future commissions. This is consistent with the overarching purpose of the agreement, which was to move McCarthy to a position as a commissioned representative after he received the proper credentials.

This latter point also provides an independent basis for refusing to enforce the indemnity clause against McCarthy. The Agreement had a limited purpose and scope: "The purpose of this contract is to memorialize the understanding between Prim Securities and the Representative as to all aspects of their relationship as it relates to commissions generated by securities transactions. *Nothing in this agreement shall apply to advisory fees, fees or other benefits generated by Representative*." (Emphasis added). The Agreement is unambiguous. Even if the indemnity clause did apply retroactively, it could only apply to aspects of the relationship related to commissions generated by securities transactions. Here, the undisputed facts are that McCarthy did not receive commissions as a result of the Partnership Transactions that resulted in arbitration. McCarthy was a salaried employee at the time that the Bennett Partnership was brought in as a Prim client.

Finally, assuming for the sake of argument that the indemnity clause[6] could apply to McCarthy's dealings with the Bennett partnership, Prim has not come forward with adequate evidence that McCarthy was negligent. Although Prim's Complaint alleges that McCarthy was responsible for the mixup with the Partnership's investment plan, McCarthy avers otherwise. According to McCarthy, Delfre supervised his work and any proposals he participated in could

6 Prim's Lombardo avers that McCarthy promised to be "responsible" for the Bennett Partnership account prior to Prim submitting a proposal. This cannot serve as the basis for imposing an indemnity obligation for a number of reasons. First, Prim's Complaint relies exclusively on the contractual indemnity provision. Second, because the contract is unambiguous this extrinsic evidence has no bearing on the interpretation of the Agreement's indemnity clause. Third, Prim has cited no authority for the proposition that a vague oral promise to accept responsibility equates to an indemnity obligation, particularly where Prim has failed to demonstrate McCarthy's negligence.

not be his work product since he was not a registered representative at the time. The actual agreements that set up the account—with the ambiguous dual reference to Navallier as manager and the PACS 80 profile—were signed by Delfre.

The only evidence of negligence on McCarthy's part is the fact that he brought the Partnership's account to Prim in the first place and the averments that Lombardo was skeptical of opening an account involving Bennett.[7] However, Prim does not explain how experienced professionals such as Lombardo and Delfre were compelled to follow the advice of their green recruit.[8] More importantly, despite McCarthy's challenges Prim has failed to come up with any conceivable duty that McCarthy breached or to establish a standard of care that he violated.

For all of these reasons, the Court concludes that McCarthy is not obligated to indemnify Prim for the losses related to the Bennett Partnership. The indemnity clause does not have retroactive effect, the underlying transactions that resulted in the arbitration were not an aspect of the McCarthy-Prim relationship governed by the Registered Representative Agreement, and Prim has not set forth any colorable basis for finding McCarthy negligent. Because McCarthy had no obligation to indemnify Prim, the Court need not address whether Prim improperly neglected to include McCarthy in the arbitration proceedings or the impact of Prim's own negligence.

---

[7] Prim also notes that McCarthy participated in an January 2001 conference call with Bennett and faxed documents to Bennett around the same time. These events occurred well after the problems with the account were discovered and are irrelevant.

[8] McCarthy has provided the affidavit of Michael Brady, a former Prim shareholder who avers that Lombardo could have vetoed any relationship with the Bennett Partnership.

Defendant's Counts I - III

Counts I - III of McCarthy's Counterclaim all relate to Prim's failure to pay Myers University for the CFP classes. The Court concludes that McCarthy is entitled to Summary Judgment on both the breach of contract (Count I) and promissory estoppel (Count II) theories. McCarthy's conversion (Count III) claim must be denied.

In order to prevail on his breach of contract claim, plaintiff must demonstrate a valid contract, that he performed his obligations under the contract, that Prim failed to perform, and damages. *Garaholo v. Chicago Title Ins. Co.*, 661 N.E.2d 218, 226 (Ohio App. 1995). Plaintiff has submitted a number of documents in which Prim agreed to pay Myers the tuition. He has also submitted his affidavit and the affidavit of Michael Brady, the Prim shareholder who agreed to pay the tuition on Prim's behalf. Brady avers that PSI "did agree to pay for the coursework at Myers University necessary for Will McCarthy to obtain the designation 'Certified Financial Planner . . . .'"

Despite Prim's claims to the contrary, McCarthy performed on his side of the bargain—he attended the classes and received the certification. When Prim failed to make the required payments McCarthy paid the full amount due to protect his credit. He has been damaged to the full amount of that payment or $3935.29.

In the alternative, McCarthy is also entitled to recover the tuition under a promissory estoppel theory. Promissory estoppel requires: 1) a promise; 2) reliance on the promise; 3) that the reliance was reasonable and foreseeable; and 4) injury to the promisee as a result of the promise. *Doe v. Adkins*, 674 N.E.2d 731, 737 (Ohio App. 4th Dist. 1996). The breach of contract analysis demonstrates that elements one and four have been met.

As for reliance, McCarthy states in his affidavit that he would not have participated in the classes absent Prim's promise to pay and this is buttressed by the fact that Brady signed the Tuition Reimbursement Program forms early in 2000. Prim has not disputed that McCarthy relied on its promises or that the reliance was reasonable and foreseeable.

Prim's only argument as to both claims is that McCarthy did not perform his side of the bargain, since he performed very few services as a certified financial planner. Thus Prim claims it did not benefit from the classes as the parties had anticipated. However, McCarthy hardly had a chance to perform any services as a CFP, since Prim refused to pay the tuition soon after he became a Registered Representative. Brady was the only person at Prim who was familiar with the tuition reimbursement program and states in his affidavit that he had no recollection of any condition or restriction on Prim's obligation to pay. Finally, Prim's conjecture that McCarthy's reason for asking Prim to sign a promissory note was to receive payment for the tuition without providing Prim any services is unsupported by evidence. The only evidence of McCarthy's motivation for leaving Prim is his affidavit statement that his departure resulted from Prim's refusal to fulfill its obligations. Accordingly, McCarthy is entitled to summary judgment on Counts I and II.

McCarthy's Count III for conversion is merely an alternative claim to Counts I and II. The factual basis for all three claims is the same and McCarthy seeks the same relief as to each claim in his motion. (Doc. 67 ¶ (1)(a)). Nonetheless, the Court will briefly address this alternative claim.

A claim for conversion requires the following: 1) the defendant's (Prim's) exercise of dominion or control; 2) over the plaintiff's (McCarthy's) property; and 3) in a manner

inconsistent with the plaintiff's (McCarthy's) right of ownership. *State Farm Mut. Auto. Ins. Co. v. Advanced Impounding and Recovery Servs., Ltd.*, 848 N.E.2d 534, 537 (Ohio App. 2006). McCarthy's conversion claim fails for a number of reason. First, McCarthy's counterclaim alleges that he was deprived of his property when he had to pay the tuition to Myers. However, Prim never exercised dominion or control over any money that passed directly from McCarthy to Myers. Second, McCarthy's property was money. "In [Ohio], an action for conversion of money will only lie 'if identification is possible and there is an obligation to deliver the specific money in question.'" *Haul Transp. of Va., Inc. v. David Morgan*, CA 14859, 1995 Ohio App. LEXIS 2240, *9 (June 2, 1995) (quoting *Security Fed. S. & L. Assn. of Cleveland v. Keyes*, Geauga App. No. 89-G-1524 (June 29, 1990)). The *Haul* court continued:

> An action alleging conversion of cash lies only where the money involved is "earmarked" or is specific money capable of identification, e.g., money in a bag, coins or notes that have been entrusted to the defendant's care, or funds that have otherwise been sequestered, and where there is an obligation to keep intact and deliver this specific money rather than to merely deliver a certain sum.

*Id.* at *9-10 (quoting *Gray v. Liberty Nat. Life Ins. Co.*, 623 So. 2d 1156, 1160 (Ala. 1993)).

In sum, the only money that Prim ever exercised dominion over—the money it never paid—was not McCarthy's. Nor could Prim exercise dominion over the money that McCarthy paid to Myers. What McCarthy is really attempting to do is to restate a breach of contract claim as a conversion claim. This is not allowed in Ohio. *Kindle Road Co., LLC v. Trickle*, No. 03CA99, 2004 Ohio App. LEXIS 4247, *18 (Sept. 2, 2004) (holding that the claimants' "claim for conversion is precluded by their recovery on their breach of contract claim"); *Boston v. Sealmaster, Indus.*, E-03-040, 2004 Ohio App. LEXIS 3884, *20 (Aug. 30, 2004) ("Courts have historically viewed actions for breach of contract and conversion to be alternate causes of

action.”).

For these reasons, McCarthy is entitled to summary judgment on both the contract (Count I) and promissory estoppel (Count II) claims. McCarthy cannot recover upon Count III (conversion). Based on this conclusion, the Court *sua sponte* enters judgment in favor of Plaintiffs on McCarthy’s Count III. McCarthy is entitled to judgment in the amount of $3,935.29 plus interest from February 26, 2001.[9]

Defendant’s Count IV

McCarthy’s Count IV seeks a minimum wage under the Fair Labor Standards Act (“FLSA”), 29 U.S.C. § 201 *et seq*, for the period that he was at Prim but unpaid. It is undisputed that McCarthy was not paid from June 15, 2000 through the end of his employment on February 26, 2001. Regarding McCarthy’s eligibility for the minimum wage, the parties dispute whether McCarthy was an “employee” entitled to a minimum wage or an independent contractor exempt from the requirements of the FLSA. *See* 29 U.S.C. § 203; *Lilley v. BTM Corp*., 958 F.2d 746, 750 (6th Cir. 1992).

Whether McCarthy is an employee is determined by the “economic realities” test. *Fegley v. Higgins*, 19 F.3d 1126, 1131 (6th Cir. 1994). This test “looks to whether the putative employee is economically dependent upon the principal or is instead in business for himself.” *Lilley*, 958 F.2d at 750. “This test is a loose formulation, leaving the determination of

9 Ohio litigants are entitled to prejudgment interest on breach of contract claims from the time that the amount at issue becomes due and payable. *Royal Elec. Constr. Co. v. Ohio State Univ.*, 652 N.E.2d 687, 690-91 (Ohio 1995); *Schneider, Smeltz, Ranney & Lafond P.L.C. v. Kedia*, 796 N.E.2d 553, 557 (Ohio App. 2003). Prim has not disputed that the start date is February 26, 2001 with respect to Counts I, II and V.

employment status to case-by-case resolution based on the totality of the circumstances." *Id*. The Sixth Circuit has provided six factors to guide courts in applying the economic realities test:

> 1) the permanency of the relationship between the parties; 2) the degree of skill required for the rendering of the services; 3) the worker's investment in equipment or materials for the task; 4) the worker's opportunity for profit or loss, depending upon his skill; and 5) the degree of the alleged employer's right to control the manner in which the work is performed[; and 6)] whether the service rendered is an integral part of the alleged employer's business.

*Donovan v. Brandel*, 736 F.2d 1114, 1117 & n.5 (6th Cir. 1984). An employee's status under the FLSA is determined as a matter of law. *Fegley*, 19 F.3d at 1131.

Before the Court reaches the issue of McCarthy's status, it must first address Prim's contention that McCarthy's claim is barred by the applicable statute of limitations. The FLSA has a statute of limitations of two years, or, in the case of willful violations, three years. 29 U.S.C. § 255(a). Both McCarthy's Counterclaim (filed November 7, 2005) and Prim's Complaint (filed March 24, 2005) were filed over four years after McCarthy's employment ended on February 26, 2001.

McCarthy first responds that Prim has waived its statute of limitations defense by failing to raise it in its answer to his Counterclaim. The statute of limitations is an affirmative defense that must be properly raised. *Broadcast Music, Inc. v. Roger Miller Music, Inc*., 396 F.3d 762, 783 (6th Cir. 2005). Affirmative defenses should be raised in the first responsive pleading. Fed. R. Civ. P. 8(c); *Horton v. Potter*, 369 F.3d 906, 911 (6th Cir. 2004). However, "[f]ailure to raise an affirmative defense by responsive pleading does not always result in waiver." *Smith v. Sushka*, 117 F.3d 965, 969 (6th Cir. 1997); *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1445 (6th Cir. 1993). Courts look to the purpose of Fed. R. Civ. P. 8(c) which is to give the opposing party timely notice of the affirmative defense and an opportunity to respond.

*Smith*, 117 F.3d at 969; *see also Stupak-Thrall v. Glickman*, 346 F.3d 579 (6th Cir. 2003) (explaining that the party opposing the statute of limitations defense is not prejudiced when they "had a fair opportunity to respond" and were not "unfairly surprised"); *Quality Tech. Co. v. Stone & Webster Eng'g Co.*, 745 F. Supp. 1331, 1336 (E.D. Tenn. 1989).

Accordingly, a number of courts have allowed an affirmative defense to be raised for the first time in briefing where the opposing party had notice and did not demonstrate prejudice. *Old Line Life Ins. Co. v. Garcia*, 418 F.3d 546, 549 (6th Cir. 2005); *Shushka*, 117 F.3d at 969; *Belluardo v. Cox Enters., Inc.*, 2005 U.S. App. LEXIS 24975, *17-18 (6th Cir. Nov. 18, 2005); *cf. Fitzgerald v. Malinckrodt, Inc.*, 681 F. Supp. 404, 405 (E.D. Mich. 1987) (finding that an affirmative defense was not waived when raised in the pretrial order). "If a [party] receives notice of an affirmative defense by some means other than pleadings, the [opposing party's] failure to comply with Rule 8(c) does not cause . . . any prejudice." *Huss v. King Co.*, 338 F.3d 647, 651 (6th Cir. 2003).

Here, McCarthy has not demonstrated prejudice or unfair surprise. His broad allusions that the failure to raise the statute of limitations "impacted his litigation strategy" do not suffice. Although he claims that he did not conduct discovery on the issue, he has not identified any discovery he might have sought. Moreover, McCarthy cannot claim to lack notice of the statute of limitations issue. His counterclaim seeks wages under the FLSA through February 28, 2001. Thus, the statute of limitations defense is apparent from the face of the counterclaim. *See Pierce v. County of Oakland*, 652 F.2d 671, 672 (6th Cir. 1981); *Pena v. Hamilton & McDonald, P.C.*, 1987 U.S. Dist. LEXIS 15739, * 4-5 (E.D. Mich. Nov. 24, 1987) ("Sixth Circuit decisions have established that the statute of limitations is not waived if an affirmative defense appears on the

face of a complaint."). Accordingly, the statute of limitations defense is not waived.

McCarthy next claims that his claim should still be allowed to go forward because it is a compulsory counterclaim. McCarthy first argues that the statute of limitations is waived or tolled by the plaintiffs' filing of a claim that results in a compulsory counterclaim. Although there is authority for the tolling argument,[10] McCarthy has not cited and the Court has not found any case where a court within the Sixth Circuit has outright waived the statute of limitations because a counterclaim was compulsory. McCarthy's tolling argument cannot save his claim either. The statute of limitations would only be tolled from the date that Prim filed its Complaint, which itself was well beyond the limitations period. *See Wright, Miller & Kane*, Federal Practice & Procedure: Civil 2d § 1149 p. 151 ("Of course, if defendant's claim already is barred when plaintiff brings suit, the notion of tolling the statute is inapplicable and the fact that the tardily asserted claim is a compulsory counterclaim does not serve to revive defendant's right to assert it.").

McCarthy's next argument is that he is entitled to bring the counterclaim as recoupment for Prim's claims. Both the Sixth Circuit and Ohio courts have recognized that a claim in recoupment is not barred by the statute of limitations. *City of Grand Rapids v. McCurdy*, 136 F.2d 615, 619 (6th Cir. 1943); *Am. Annuity Group, Inc. v. Guar. Reassurance Corp.*, 140 F. Supp. 2d 859, 873 (S.D. Ohio 2001) (applying Ohio law). However, "[r]ecoupment is a defense which arises out of the same transaction as plaintiff's claim, is a claim of right to reduce the

---

[10] "Although there is some conflict on the subject, the majority view appears to be that the institution of plaintiff's suit tolls or suspends the running of the statute of limitations governing a compulsory counterclaim." *See Wright, Miller & Kane*, Federal Practice & Procedure: Civil 2d § 1149 p. 151.

amount demanded, *and can be had only to an extent sufficient to satisfy the plaintiff's claim*." *Riley v. Montgomery*, 463 N.E.2d 1246, 1248 (Ohio 1984) (emphasis added). Because McCarthy is entitled to summary judgment on Prim's claims, recoupment is unavailable.

Accordingly, Count IV is barred by the statute of limitations. Based on this conclusion, the Court *sua sponte* enters judgment in favor of Plaintiffs on McCarthy's Count IV.

Defendant's Count V

McCarthy claims that he is entitled to $626.07 that he earned under the Registered Representative Agreement. Prim's argument against McCarthy's claim is repeated in full below:

> Any monies due under the Registered Representative agreement are an offset to the monies owed to PSI through the indemnification of PSI by McCarthy based upon the negligence of McCarthy in handling The Bennett Partnership Account.

Because Prim does not dispute that the money is due McCarthy, and because Prim's indemnification claim is without merit, McCarthy is entitled to summary judgment on Count V in the amount of $626.07 plus interest from February 26, 2001.

**CONCLUSION**

The Court GRANTS Defendant's Motions for Summary Judgment on Plaintiffs' Complaint and Counts I, II and V of Defendant's Counterclaim. Defendant is entitled to judgment in the amount of $4561.36 plus interest from February 26, 2001. The Court enters judgment for Plaintiffs on Defendant's Counts III and IV.

IT IS SO ORDERED.

/s/Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge